**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES E. SHELTON, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 2:26-cv-00001 |
| *v.* | HON. JOHN M. YOUNGE |
| EVERQUOTE, INC. | |
| *Defendant.* | |

## DEFENDANT EVERQUOTE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................... 3

    A. Plaintiff Completed An Online Form And Accepted The Terms Of Use By Clicking "Get My Quotes." ..................................................................... 3

    B. EverQuote's Arbitration Agreement Applies To Any And All Claims Between Plaintiff And EverQuote ..................................................................... 4

    C. Plaintiff's Claims Arose Because He Provided His Consent On The Website. ............. 6

III.    LEGAL STANDARD ....................................................................... 6

IV.    ARGUMENT ................................................................................ 8

    A. Plaintiff's Claims Are Subject To Mandatory Arbitration. ............................ 8

       1.   Plaintiff Entered a Valid and Enforceable Arbitration Agreement with EverQuote. ............................................................... 9

       2.   The Arbitration Agreement Contains a Valid Delegation Clause. ............ 12

       3.   Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement. ............................................................... 13

    B. Arbitration Is Required To Proceed On An Individual Basis, And Plaintiff's Class Claims Must Be Dismissed Or This Case Must Be Stayed. ............................... 14

    C. EverQuote Demands A Jury Trial On Arbitrability If The Court Determines There Is A Disputed Fact Issue. ............................................................... 16

V.    CONCLUSION ................................................................................ 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*,
   584 F.3d 575 (3d Cir. 2009)...........................................................................10

*American Express Co. v. Italian Colors Restaurant.*,
   570 U.S. 228 (2013).......................................................................................8

*AT & T Technologies, Inc. v. Communications Workers of America*,
   475 U.S. 643 (1986).....................................................................................13

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)..................................................................................6, 8

*Blair v. Scott Specialty Gases*,
   283 F.3d 595 (3d Cir. 2002).........................................................................10

*Blueprint Cap. Advisors, LLC v. Div. of Inv.*,
   2023 WL 8866554 (3d Cir. Dec. 22, 2023) ..................................................12

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London,*
   *subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*,
   584 F.3d 513 (3d Cir. 2009).........................................................................10

*Clerk v. First Bank of Del.*,
   735 F. Supp. 2d 170 (E.D. Pa. 2010) ...........................................................15

*Cronin v. CitiFinancial Servs., Inc.*,
   352 F. App'x 630 (3d Cir. 2009)...................................................................15

*Cullinane v. Uber Techs., Inc.*,
   893 F.3d 53 (1st Cir. 2018) ...........................................................................8

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)..................................................................................7, 8

*Dobbs v. Health IQ Ins. Servs.*,
   2022 WL 2974713 (E.D. Pa. July 27, 2022)..................................................11

*Epic Systems Corp. v. Lewis*,
   138 S.Ct. 1612 (2018)...............................................................................6, 7

*Feldman v. Google, Inc.*,
   513 F. Supp. 2d 229 (E.D. Pa. 2007) ...........................................................11

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995)..................................................................................8, 9

*Gilmer v. Interstate/Johnson Lane Corp.*,
   500 U.S. 20 (1991)....................................................................................6, 7

*Gove v. Career Sys. Dev. Corp.*,
   689 F.3d 1 (1st Cir. 2012) .............................................................................7

*HealthplanCRM, LLC v. AvMed, Inc.*,
   458 F. Supp. 3d 308 (W.D. Pa. 2020).....................................................10, 13

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019)....................................................................................8, 9

*Lamps Plus, Inc. v. Varela*,
   587 U.S. 176 (2019).....................................................................................15

*Liptak v. Accelerated Inventory Mgmt., LLC*,
   2021 WL 650514 (W.D. Pa. Feb. 19, 2021) ...........................................10, 11

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
  514 U.S. 52 (1995) .......................................................................................... 13
*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
  247 F.3d 44 (3d Cir. 2001) ............................................................................. 13
*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983) ........................................................................................ 7, 8
*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ............................................................................ 10
*Pricharda v. Checkr, Inc.*,
  2022 WL 16749033 (E.D. Pa. Nov. 7, 2022) .................................................. 11
*Putt v. Tripadvisor Inc.*,
  2021 WL 242470 (E.D. Pa. Jan. 25, 2021) ..................................................... 11
*Quiles v. Fin. Exch. Co.*,
  2005 PA Super 250 (July 6, 2005) .................................................................. 10
*R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*,
  447 F. Supp. 3d 339 (W.D. Pa. 2020) ............................................................. 16
*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ................................................................................ 8, 9, 12
*Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*,
  739 A.2d 133 (1999) ........................................................................................ 10
*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) ..................................................................................... 7, 15
*Zabokritsky v. Jetsmarter, Inc.*,
  2019 WL 2563738 (E.D. Pa. June 20, 2019) .................................................. 10

**Statutes and Rules**

9 U.S.C. § 2 ............................................................................................................ 6, 9
9 U.S.C. § 3 ............................................................................................................ 7, 9
9 U.S.C. § 4 .......................................................................................................... 7, 19

Defendant EverQuote, Inc. ("EverQuote"), by and through its undersigned counsel, hereby moves this Honorable Court for an Order compelling Plaintiff James E. Shelton ("Plaintiff") to individual arbitration and dismissing or staying the above-captioned action.

## I. **INTRODUCTION**

This case does not belong in court. Plaintiff's claims belong in mandatory, individual arbitration before the American Arbitration Association ("AAA"), not in litigation, and certainly not on a classwide basis.

Plaintiff alleges that he received unsolicited telemarketing text messages from EverQuote, between October and November 2025 in alleged violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. However, without admitting that any statutory violation occurred, the only way EverQuote's system could have obtained Plaintiff's telephone number and initiated these text messages is if Plaintiff visited auto.provide-insurance.com (the "Website")—a website owned and operated by EverQuote—and affirmatively requested auto insurance quotes by entering his personal information and clicking a button expressly agreeing to the Website's Terms of Use. *See* Declaration of Madeline Contois ("Contois Decl.") at ¶¶ 6-13, 17 (attached to this filing as Exhibit A); *see also* Exhibit B (Terms of Use).

Indeed, EverQuote's internal business records definitively establish that on October 7, 2025, Plaintiff made precisely such a request for insurance quotes on the Website. *Id.* at ¶ 9. Because the Website is owned and operated by EverQuote, Plaintiff's submission was securely captured and maintained directly in EverQuote's internal database in the regular course of business. *Id.* at ¶¶ 6-8. While on the Website, Plaintiff did not merely enter a random phone number in a vacuum; he entered a highly specific profile of identifying information, including his first name ("James"), his last name ("Shelton"), his personal email address, his phone number, and his

residential address in Pennsylvania. *Id.* at ¶ 10.

In doing so, Plaintiff was put on clear, inquiry notice of EverQuote's conspicuously displayed and hyperlinked Terms of Use, and informed that by clicking a prominent orange button labeled "Get My Quotes," he was agreeing to those Terms. *Id.* at ¶¶ 11-13. Specifically, Plaintiff accepted the following disclosure located directly below the "Get My Quotes" button:

> "By clicking Get My Quotes and submitting this form, I am providing express written consent to being contacted by you... By clicking Get My Quotes and submitting this form, I affirm that I have read and agree to this website's Privacy Policy and Terms of Use, ***including the arbitration provision*** and the E-SIGN Consent."

*Id.* at ¶ 14 (emphasis added).

Although Plaintiff—a frequent TCPA litigator—may attempt to deny ever visiting the Website or submitting his information, that assertion is directly rebutted by EverQuote's own internal systems of record. *Id.* at ¶ 10. The presence of this identifying data captured directly on an EverQuote owned-and-operated property definitively confirms that Plaintiff interacted with the Website, reviewed the consent language, and voluntarily agreed to its terms.

The Terms of Use, which Plaintiff agreed to be bound by, contain a mandatory and binding arbitration agreement (the "Arbitration Agreement"). Exhibit B. The Arbitration Agreement, which is governed by the Federal Arbitration Act ("FAA"), requires that Plaintiff and EverQuote resolve all claims that cannot be resolved after written notice through final and binding arbitration governed by the AAA. *Id.* at Section 2. Crucially, the Agreement contains a valid delegation clause that strips this Court of the authority to decide threshold questions. It expressly mandates that: "All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement." *Id.* Accordingly, Plaintiff agreed to submit his claims against EverQuote to arbitration, including the threshold issue of arbitrability.

Additionally, the Terms contain a strict Class Action Waiver, expressly stating that "THE

ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER

PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY

FORM OF A REPRESENTATIVE OR CLASS PROCEEDING." *Id.* As such, Plaintiff forfeited

his right to participate in a class action and to a jury trial when he submitted his request on the

Website.

Because Plaintiff's claims are based on text messages arising directly out of his submission

on EverQuote's owned and operated Website, Plaintiff's claims fall squarely within the scope of

the Arbitration Agreement. *Id.* Accordingly, this Court's role is strictly limited to enforcing the

delegation clause, compelling Plaintiff to submit his claims to individual arbitration, and

dismissing or staying this action.

Accordingly, under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*, EverQuote

moves to compel arbitration and dismiss this case.

## II. <u>FACTUAL BACKGROUND</u>

### A. **Plaintiff Completed An Online Form And Accepted The Terms Of Use By Clicking "Get My Quotes."**

On October 7, 2025, Plaintiff visited the website auto.provide-insurance.com, which is

owned and operated by EverQuote. Contois Decl. at ¶¶ 6, 9. Because the Website is an owned and

operated property of EverQuote, user submissions are captured and maintained directly within

EverQuote's internal databases in the regular course of business. *Id.* at ¶¶ 6-8.

While he was on the Website, he entered his first name "James," his last name "Shelton,"

his Pennsylvania residential address, and his phone number ending in 3942, and accepted the

following disclosure:

> By clicking Get My Quotes and submitting this form, I am providing express
> written consent to being contacted by you, <u>EverQuote Marketing Partners</u>, or
> by one or more agents or brokers of your partners which companies I agree may

reach me to discuss my interest, including offers of insurance, at the phone number and/or email address I have provided to you in submitting this form and/or additional information obtained. I consent by electronic signature to being contacted by telephone (via call and/or text) for marketing/telemarketing purposes at the phone number I provided in this form, even if my phone number is listed on a Do Not Call Registry, and I agree that such contact may be made using an automatic telephone dialing system and/or an artificial or prerecorded voice (standard call, text message, and data rates apply). I can revoke my consent at any time. I also understand that my agreement to be contacted is not a condition of purchasing any property, goods or services, and that I may call 1-855-840-1737 to speak with someone about obtaining an insurance quote.By clickingGet My Quotes and submitting this form, I affirm that I have read and agree to this website's <u>Privacy Policy</u> and <u>Terms of Use</u>,including the arbitration provision and the <u>E-SIGN Consent</u>.

*Id.* at ¶¶ 10, 11. This disclosure clearly states that by clicking the "Get My Quotes" button, the user agrees to the Website's Terms of Use, which explicitly includes binding arbitration. *Id.* at ¶¶ 13-15. EverQuote's Privacy Policy, Terms of Use, and E-SIGN Consent are hyperlinked in underlined text within the disclosure. *Id.* at ¶ 16.

**B. EverQuote's Arbitration Agreement Applies To Any And All Claims Between Plaintiff And EverQuote.**

The linked Terms of Use that Plaintiff accepted contain a mandatory, binding Arbitration Agreement and Class Action Waiver. *Id.* at ¶ 19. Specifically, Section 2 of the Terms states in relevant part:

**2. Dispute Resolution By Binding Arbitration**

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.** You agree to attempt in good faith to settle any dispute or claim that has or may arise between us, which arises out of or relates in any way to these Terms or your use of the Site or the Content, including, without limitation, any dispute or claim between you and a Provider (each, a "Claim")…**You agree to arbitrate all Claims between you and us, or any Provider, that cannot be amicably resolved in accordance with the foregoing paragraph.** This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to: (a) claims arising out of or relating to any aspect of your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; and (b) claims that could be alleged as class action Claims (and you agree to

waive the right to participate in a class action in accordance with this Section 2)…You agree that, by entering into this arbitration agreement, you and we are each waiving our respective rights to a trial by jury or to participate in a class or representative action, and that arbitration of disputes pursuant to this Section 2 shall be in your individual capacity. THIS MEANS YOU ARE LIMITING YOUR RIGHT TO APPEAL AND ARE WAIVING YOUR RIGHTS TO OTHER AVAILABLE RESOLUTION PROCESSES, SUCH AS A COURT ACTION…

The arbitration will be governed by the American Arbitration Association ("AAA") under its then-prevailing rules and procedures… The arbitrator is bound by the terms of this Agreement and shall apply Delaware law consistent with the Federal Arbitration Act and applicable statutes of limitations, and shall honor claims of privilege recognized at law. All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement…

DO NOT USE THIS SITE IF YOU DO NOT AGREE TO THE FOREGOING BINDING ARBITRATION PROVISIONS.

*See* Exhibit B (emphasis added in original); Contois Decl. at ¶ 19. Accordingly, because Plaintiff accepted the Website's disclosure, he expressly agreed to submit his claims against EverQuote to arbitration, including the threshold issue of arbitrability.

Because Plaintiff entered his personal information on the Website and accepted the disclosure, he expressly agreed to be bound by the terms contained therein, including mandatory arbitration under the AAA rules.

Additionally, the Terms contain the following Class Action Waiver:

**THE ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING.**

Exhibit B; Contois Decl. at ¶ 20. As such, Plaintiff forfeited his right to participate in a class action and to a jury trial when he submitted his request on the Website, thereby accepting EverQuote's Terms.

**C.  Plaintiff's Claims Arose Because He Provided His Consent On The Website.**

In his Complaint, Plaintiff claims to have received allegedly unsolicited telemarketing text messages to his cell phone while it was registered on the National Do Not Call Registry, and without the transmission of accurate caller ID information, in violation of the TCPA. Complaint ("Compl.") at ¶¶ 21-26, 46-54.

Without admitting any liability, the only way EverQuote could have obtained Plaintiff's information and phone number is if he submitted a request for insurance quotes on the Website and explicitly consented to being contacted. Contois Decl. at ¶ 17. The disclosure Plaintiff accepted expressly authorized contact "by telephone (via call and/or text) for marketing/telemarketing purposes at the phone number [he] provided in [the] form, even if [the] phone number is listed on a Do Not Call Registry." *Id.* at ¶ 14.

Therefore, Plaintiff's claims regarding the text messages he allegedly received "arise[] out of or relate[] in any way to [the] Terms or [his] use of the Site," and therefore fall squarely within the broad scope of the Arbitration Agreement. Exhibit B.

**III. LEGAL STANDARD**

The Federal Arbitration Act ("FAA") codifies a strong federal policy in favor of enforcing arbitration agreements, including agreements to arbitrate statutory claims. *See* 9 U.S.C. § 2; *Epic Systems Corp. v. Lewis*, 138 S.Ct. 1612, 1621 (2018) ("The [FAA], this Court has said, establishes 'a liberal federal policy favoring arbitration agreements.'"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24-25 (1991) (holding that FAA provisions demonstrate federal policy that favors arbitration and its purpose was to reverse the longstanding judicial hostility to arbitration agreements); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (noting that the FAA's "principal purpose . . . is to ensure that private arbitration agreements are enforced

according to their terms").

"[I]n Congress's judgment arbitration ha[s] more to offer than courts recognized – not least the promise of quicker, more informal, and often cheaper resolutions for everyone involved." *Epic Systems*, 138 S. Ct. at 1621; *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) (noting that arbitration allows parties to resolve their claims for "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes"). Thus, "by agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26.

The FAA permits a party to move to compel arbitration when an opposing party refuses to arbitrate as required by a valid arbitration agreement. 9 U.S.C. §§ 3, 4. According to the Supreme Court, the FAA "leaves no place for the exercise of discretion by a [trial] court, but instead mandates that [trial] courts *shall* direct the parties to proceed to arbitration" on all claims covered under the agreement. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Courts, therefore, should "move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Id.* at 22.

Principles of state contract law control whether a valid arbitration agreement exists. *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012). "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Cullinane v. Uber Techs., Inc.*, 893

F.3d 53, 61 (1st Cir. 2018) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## IV. <u>ARGUMENT</u>

### A. Plaintiff's Claims Are Subject To Mandatory Arbitration.

The Arbitration Agreement Plaintiff entered is governed by the FAA. *See* Exhibit B; Contois Decl., at ¶ 19. The FAA requires district courts to compel arbitration of claims covered by an enforceable arbitration agreement. 9 U.S.C. § 3. Under the FAA, an agreement to arbitrate, like the one in the EverQuote's Terms of Use that was linked in the disclosure Plaintiff accepted, "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Moses*, 460 U.S. at 24. The FAA reflects the "fundamental principle that arbitration is a matter of contract," and places arbitration agreements on "equal footing with other contracts." *AT&T*, 563 U.S. at 339 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). And because "arbitration is a matter of contract, [ ] courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 586 U.S. 63, 67 (2019) (quoting *Rent-A- Center,* 561 U.S. at 67).

Additionally, the Supreme Court has instructed courts to "'rigorously enforce' arbitration agreements according to their terms . . . including terms that 'specify *with whom* [the parties] choose to arbitrate their disputes," . . . and 'the rules under which that arbitration will be conducted.'" *American Express Co. v. Italian Colors Restaurant.,* 570 U.S. 228, 233 (2013) (citations omitted). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.,* 470 U.S. at 218. The Supreme Court has made clear that "parties may agree to have an arbitrator decide not only

the merits of a particular dispute but also ''gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein*, 586 U.S. at 67-68 (quoting *Rent-A- Center*, 561 U.S. at 68-69). "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id*. at 69 When considering whether there is a valid delegation, the court undertakes a limited inquiry into whether the parties clearly and unmistakably delegated the power to decide arbitrability to the arbitrator. *Id*. ("This Court has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence.") (citation omitted).

Here, Plaintiff entered into a valid contract with EverQuote that includes a mandatory arbitration provision. EverQuote's Terms of Use encompasses an enforceable Arbitration Agreement that Plaintiff voluntarily accepted. Exhibit 2; Contois Decl. at ¶¶ 18, 19. By expressly reserving all threshold issues of enforceability for the arbitrator, the Terms of Use divest this Court of the authority to adjudicate them. Accordingly, EverQuote respectfully requests that this Court enforce the agreement as written, compel Plaintiff to individual arbitration before the AAA, and dismiss this litigation.

### 1.  *Plaintiff Entered a Valid and Enforceable Arbitration Agreement with EverQuote.*

In determining the validity of agreements to arbitrate which are subject to the FAA, courts generally apply ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc*, 514 U.S. at 944 ("The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration.") (citation omitted). "In general, to determine whether a contract was formed under Pennsylvania law, a court must look to: (1) whether both parties manifested an intention to be

bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 533 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002); *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 136 (1999); *Quiles v. Fin. Exch. Co.*, 2005 PA Super 250, 285 (July 6, 2005)).

"Although the enforceability of web-based agreements will often depend on a 'fact-intensive inquiry,' the Court may determine that a web-based agreement to arbitrate exists where notice of the agreement was 'reasonably conspicuous and manifestation of assent unambiguous as a matter of law.'" *Liptak v. Accelerated Inventory Mgmt., LLC*, No. 2:20-CV-967, 2021 WL 650514, at *2 (W.D. Pa. Feb. 19, 2021) (quoting *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa. 2020)). "[I]n assessing whether a party manifested an intent to enter a contract, the Court looks not to inward, subjective intent but, rather, to the "intent a reasonable person would apprehend in considering the parties' behavior." *Id.* (quoting *HealthplanCRM*, 458 F. Supp. 3d at 331-32 (quoting *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009)). "[A]n internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Id.* (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 222 (2d Cir. 2016). "Whether the user actually reads the terms to which she assents is immaterial." *Id.* (quoting *Zabokritsky v. Jetsmarter, Inc.*, No. 19-273, 2019 WL 2563738, *3 (E.D. Pa. June 20, 2019)).

The Website—currently and at the time of Plaintiff's visit—utilizes a "clickwrap" agreement which provides users with clear, uniform notice of its binding terms and captures their affirmative assent before completing an internet transaction. Contois Decl. at ¶ 15. Courts in the

Eastern District of Pennsylvania have consistently held "that 'clickwrap' agreements manifest sufficient agreement to the terms in the contract." *Pricharda v. Checkr, Inc.*, No. 5:22-CV-3180, 2022 WL 16749033, *3 (E.D. Pa. Nov. 7, 2022) (citing *Dobbs v. Health IQ Ins. Servs.*, No. 21-cv-5276, 2022 WL 2974713, *4 (E.D. Pa. July 27, 2022); *Putt v. Tripadvisor Inc.*, No. 20-cv-3836, 2021 WL 242470, at *6 (E.D. Pa. Jan. 25, 2021) ("Clickwrap agreements are 'routinely enforced by the courts.'" (internal citation omitted))).[1] And for clickwrap agreements, "the occurrence of mutual assent ordinarily turns on whether the consumer had reasonable notice of the merchant's terms of service agreement." *Pricharda*, 2022 WL 16749033, at *3 (citation omitted).

Here, the layout of the Website requires Plaintiff to signify his affirmative acceptance of the disclosure containing the Terms of Use by clicking the "Get My Quotes" button. Contois Decl. at ¶¶ 11-13. In fact, the Terms of Use within this disclosure were underlined and prominently highlighted in bright blue font, and the disclosure explicitly mentions the arbitration provision contained within the Terms of Use. *Id*. at ¶ 15-16. This presentation easily satisfies and exceeds the "reasonably conspicuous" standard. *Liptak*, 2021 WL 650514, at *2. Indeed, a Pennsylvania court has found that a green hyperlink to an agreement that contained an arbitration provision was legally sufficient to establish notice. *Id.* at *1-2. Because EverQuote's hyperlink was both underlined and set in high-contrast bright blue, it was undeniably conspicuous. Contois Decl. at ¶ 16. Therefore, when Plaintiff affirmatively clicked the "Get My Quotes" button, he agreed to the Terms of Use—including the binding and enforceable Arbitration Agreement contained in the "erms of Use. *Id*. at ¶ 15.

---

[1] "A "clickwrap" agreement is one that 'appears on an internet webpage and requires that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction.'" *Pricharda*, 2022 WL 16749033, at *3 (quoting *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)).

## 2. The Arbitration Agreement Contains a Valid Delegation Clause.

Because "arbitration is a matter of contract," the "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68-69 (citation omitted). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id*. at 70. And "[i]f the parties have a valid arbitration agreement that delegates the issue of arbitrability to an arbitrator by 'clear and unmistakable' evidence, 'a court possesses no power to decide the arbitrability issue.'" *Blueprint Cap. Advisors, LLC v. Div. of Inv.*, No. 23-1116, 2023 WL 8866554, *2 (3d Cir. Dec. 22, 2023) (citation omitted).

Here, the Arbitration Agreement provides precisely this "clear and unmistakable" evidence of the parties' intent to delegate threshold questions to the arbitrator. Section 2 of the Terms of Use, which Plaintiff affirmatively accepted, explicitly dictates: "All issues are for the arbitrator to decide, including, without limitation, issues relating to the applicability and enforceability of this arbitration agreement…" Exhibit B; Contois Decl. at ¶ 19. This language is absolute and unequivocal. It leaves no room for ambiguity. The parties expressly agreed that an arbitrator, rather than a judge, must resolve any disputes regarding whether the Arbitration Agreement is valid, applicable, or enforceable against the Plaintiff.

Furthermore, the Arbitration Agreement expressly incorporates the rules of the American Arbitration Association ("AAA"). Exhibit B. And the incorporation of AAA rules—which explicitly empower the arbitrator to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement—constitutes independent,

clear, and unmistakable evidence that the parties agreed to delegate arbitrability. *See HealthplanCRM*, 458 F. Supp. 3d at 313-14 (finding that incorporation of AAA rules is sufficiently clear and unmistakable to delegate arbitrability issues to the arbitrator where the contract leaves "no room for ambiguity"). Thus, because the delegation clause is valid, binding, and unambiguously clear, this Court's inquiry must end here. By the express terms of the contract Plaintiff accepted, those issues are strictly reserved for the arbitrator. Therefore, Plaintiff agreed to submit questions of arbitrability, including questions regarding the validity of the agreement to arbitrate, to the arbitrator.

### 3. *Plaintiff's Claims Fall Within the Scope of the Arbitration Agreement.*

Notwithstanding the valid delegation clause—which exclusively reserves this determination for the arbitrator—there can be no serious dispute that the Arbitration Agreement covers all of Plaintiff's TCPA claims. In evaluating the scope of valid and enforceable arbitration agreements, federal policy dictates that courts should strongly favor compelling arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) ("[F]ederal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration." (citation omitted)).

An arbitration clause is considered "broad" if it covers all disputes arising out of or relating to a contract, as opposed to a "narrow" clause that covers only specific types of disputes. Under a broad arbitration provision like the one at issue here, a presumption of arbitrability applies, and "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986) (citation omitted).

The Arbitration Agreement Plaintiff accepted is undeniably broad. It explicitly mandates arbitration for "any dispute or claim that has or may arise between us, which arises out of or relates in any way to these Terms or your use of the Site or the Content." Exhibit B; Contois Decl. at ¶ 19. The Terms of Use goes even further to ensure total coverage, including that the agreement to arbitrate "is intended to be broadly interpreted" and expressly includes "claims arising out of or relating to any aspect of your relationship with us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." Exhibit B; Contois Decl. at ¶ 19.

Plaintiff's statutory TCPA claims turn entirely on whether he consented to be contacted at the phone number he provided. Without admitting any liability for the alleged text messages at issue, the only way EverQuote or its partners could have obtained Plaintiff's number is precisely because Plaintiff entered his information on the Website and clicked the "Get My Quotes" button. Contois Decl. at ¶ 17. By taking that action, the disclosure on the Website establishes that Plaintiff explicitly granted his "express written consent... to being contacted by telephone (via call and/or text) for marketing/telemarketing purposes at the phone number I provided in this form..." *Id.* at ¶ 14.

Therefore, Plaintiff's purported TCPA claims arise directly from his use of the Website and the express consent he provided as contemplated by the Terms of Use. Because Plaintiff's claims are indivisibly linked to his interactions with the Website and fall squarely within the expressly broad statutory scope of the Arbitration Agreement, the presumption of arbitrability clearly applies. Accordingly, the Court must enforce the agreement as written, compel arbitration, and dismiss or stay this proceeding.

**B. Arbitration Is Required To Proceed On An Individual Basis, And Plaintiff's Class Claims Must Be Dismissed Or This Case Must Be Stayed.**

The Supreme Court has held that parties are "generally free to structure their arbitration

agreements as they see fit" and may: 1) "agree to limit the issues they choose to arbitrate," 2) "may agree on rules under which any arbitration will proceed," 3) "may choose who will resolve specific disputes," and 4) "may specify *with whom* they choose to arbitrate their disputes." *Stolt-Nielsen S.A.*, 559 U.S. at 683 (emphasis added in original) (internal quotation marks and citations omitted). As a result, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party ***agreed to do so***." *Id.* at 684 (emphasis added). "Courts may not infer from an ambiguous agreement that parties have consented to arbitrate on a classwide basis." *Lamps Plus, Inc. v. Varela,* 587 U.S. 176, 189 (2019).

Class action waivers in arbitration provisions are enforceable so long as the waiver does not "effectively ensure[s] that a defendant will never face liability for wrongdoing." *Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 186 (E.D. Pa. 2010) (citing *Cronin v. CitiFinancial Servs., Inc.*, 352 F. App'x 630, 635 (3d Cir. 2009)).

In this case, the Arbitration Agreement leaves absolutely no room for inference or ambiguity. Although Plaintiff attempts to bring this action on behalf of a putative class, the Terms of Use he accepted explicitly foreclose classwide proceedings. Section 2 of the Terms of Use unequivocally mandates that "arbitration of disputes pursuant to this Section 2 shall be in your individual capacity" and contains a strict, capitalized Class Action Waiver: "THE ARBITRATOR MAY NOT CONSOLIDATE, COMBINE, OR JOIN THE CLAIMS OF OTHER PARTIES WHO MAY BE SIMILARLY SITUATED OR OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING." Exhibit B; Contois Decl. at ¶ 19. By clicking "Get My Quotes" and agreeing to these terms, Plaintiff expressly waived any right to participate in a class action or to have his claims heard on a representative basis. Consequently, Plaintiff cannot manufacture a class action here and must be compelled to pursue his claims solely on an

individual basis. As such, dismissal of the matter, or alternatively, staying the case pending the outcome of individual arbitration, is the legally mandated and most effective path forward. *R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339, 349-50 (W.D. Pa. 2020) (granting motion to compel arbitration and staying case).

Therefore, EverQuote respectfully requests that this Court dismiss Plaintiff's class claims, compel Plaintiff to submit his individual claims to arbitration, and dismiss or stay the remainder of this action.

### C. EverQuote Demands A Jury Trial On Arbitrability If The Court Determines There Is A Disputed Fact Issue.

EverQuote has presented evidence that the parties entered into a valid and enforceable arbitration agreement covering Plaintiff's claims in this case. If the Court nonetheless determines that there is a disputed issue of fact as to Plaintiff's agreement to arbitrate his claims, EverQuote demands a jury trial on the issue pursuant to Section 4 of the FAA. *See* 9 U.S.C. § 4 ("If the jury find that an agreement for arbitration was made in writing . . . the court shall make an order summarily directing the parties to proceed with arbitration in accordance with the terms thereof.").

## V. CONCLUSION

For the foregoing reasons, EverQuote respectfully requests the Court compel the arbitration of Plaintiff's claims.

Dated: February 27, 2026

Respectfully submitted,

*/s/ V. Amanda Witts*
V. Amanda Witts, Esq. (Bar No. 308902)
MITCHELL SANDLER PLLC
2020 K Street NW, Suite 760
Washington, D.C. 20006
(202) 886-5267
v.awitts@mitchellsandler.com

AND

Eric J. Troutman (*pro hac vice* forthcoming)
California Bar No. 229263
Puja J. Amin (*pro hac vice* forthcoming)
California Bar No. 299547
Tori L. Guidry (*pro hac vice* forthcoming)
Louisiana Bar No. 37704
TROUTMAN AMIN, LLP
400 Spectrum Center Drive, Suite 1550
Irvine, California 92618
Telephone: (949) 350-3663
Facsimile: (214) 758-1550
troutman@troutmanamin.com

*Attorney for Defendant EverQuote, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 27, 2026, a copy of the foregoing was filed electronically and served by other electronic means on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by e-mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ V. Amanda Witts*
V. Amanda Witts, Esq.